## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VICTAULIC COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-00887-CFC |
| ANVIL INTERNATIONAL, LLC, | **PUBLIC VERSION** |
| Defendant. | JURY TRIAL DEMANDED |
| ANVIL INTERNATIONAL, LLC, | |
| Counterclaim-Plaintiff, | |
| v. | |
| VICTAULIC COMPANY, | |
| Counterclaim-Defendant. | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO STAY PENDING DEFENDANT'S ANTICIPATED MOTION FOR JUDGMENT ON THE PLEADINGS TO ENFORCE PREVIOUS SETTLEMENT

OF COUNSEL:

Todd E. Jones (*pro hac vice*)
Jeffrey R. Kuester (*pro hac vice*)
Coby S. Nixon (*pro hac vice*)
Seth K. Trimble (*pro hac vice*)
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
(770) 434-6868

November 17, 2020

MORRIS JAMES, LLP
Kenneth L. Dorsney (#3726)
Courtland S. Hitch (#6720)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant and
Counterclaim-Plaintiff Anvil
International, LLC*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

THE NATURE AND STAGE OF THE PROCEEDINGS ...................................2

SUMMARY OF ANVIL's ARGUMENT................................................................4

STATEMENT OF FACTS ....................................................................................7

    I.      The Parties and their Previous Settlement Resolving All Patent Disputes as to Anvil's "SlideLOK" Couplings. ..........................................7

    II.     Victaulic's Attempt to Renege on the Parties' Settlement by Claiming that Anvil's SlideLOK 74FP Coupling is Not Covered by the Settlement Agreement When Sold With a Pre-Installed Element. ....................................................................................................9

    III.    Anvil's Counterclaim Count I Seeks a Judicial Declaration that the Settlement Agreement Grants Anvil a License Under the Asserted Patents to Sell the Accused Products. .......................................................10

    IV.    Anvil's Counterclaim Count I Also Seeks a Judicial Declaration that Victaulic's Claims are Barred by the Settlement Agreement's Covenant Not to Sue..........................................................................12

ARGUMENT .......................................................................................................13

    I.      The Court Has Discretion to Stay Litigation Pending Resolution of a Potentially Dispositive Motion. .............................................................13

    II.     All Relevant Factors Weigh in Favor of a Stay. .......................................15

          A.    Anvil's Anticipated Rule 12(c) Motion Will Dispose of the Case Under Several Possible Outcomes. ........................................16

          B.    The Early Stage of the Litigation and Minimal Investment of Resources Strongly Favor a Stay. ..................................................17

          C.    A Stay Will Not Unduly Prejudice Victaulic or Allow Anvil to Gain a Clear Tactical Advantage. ...............................................18

          D.    Anvil Will Face Significant Inequity in the Absence of a Stay..............................................................................................20

CONCLUSION ...................................................................................................22

i

# TABLE OF AUTHORITIES

## CASES

*Boston Scientific Corp. v. Cook Grp. Inc.*,
  15-cv-980-LPS-CJB, Doc. 304 (Aug. 16, 2017) ................................................19

*Coastal States Gas Corp. v. Dep't of Energy*,
  84 F.R.D. 278 (D. Del. 1979) ...............................................................................14

*Cooper Notification, Inc. v. Twitter, Inc.*,
  No. 09-cv-865-LPS, 2010 U.S. Dist. LEXIS 131385 (D. Del. Dec. 13, 2010)....19

*Cost Bros., Inc. v. Travelers Indem. Co.*,
  760 F.2d 58 (3d Cir. 1985) ...................................................................................13

*Ghaly Devices LLC v. Humor Rainbow, Inc.*,
  No. 1-19-cv-02318, Doc. 36 (S.D.N.Y. June 24, 2019) .......................................15

*Hemstreet v. Spiegel, Inc.*,
  851 F.2d 348 (Fed. Cir. 1988) ..............................................................................21

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
  264 F.3d 344 (3d Cir. 2001) .................................................................................14

*Kaavo Inc. v. Cognizant Tech. Sols. Corp.*,
  No. 14-cv-1192-LPS-CJB, 2015 U.S. Dist. LEXIS 46334 (D. Del. Apr. 9, 2015)
  ..................................................................................... 14, 16, 18, 20

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)..............................................................................................13

*LifePort Sciences, LLC v. Cook Inc.*,
  No. 13-cv-362-GMS, D.I. 56 (D. Del. Feb. 5, 2015) ...........................................16

*Neste Oil Oyj v. Dynamic Fuels, LLC*,
  No. 12-cv-1744-GMS, 2013 U.S. Dist. LEXIS 92416 (D. Del. July 2, 2013)... 13, 17, 18, 19

*P&G v. Paragon Trade Brands*,
  No. 94-cv-16-LON, 1996 U.S. Dist. LEXIS 22399 (D. Del. Mar. 29, 1996) ......21

*Princeton Digital Image Corp. v. Konami Dig. Entm't, Inc.*,
   No. 12-1461-LPS-CJB, 2014 U.S. Dist. LEXIS 61555 (D. Del. Jan. 15, 2014)..15

*Purdue Pharma L.P. v. Collegium NF, LLC*,
   No. 18-cv-226-CFC, D.I. 41 (D. Del. Dec. 10, 2018) ................................... 14, 15

*St. Clair Intellectual Prop. Consultants v. Motorola Mobility LLC*,
   No. 11-cv-1305-LPS, 2012 U.S. Dist. LEXIS 134834 (D. Del. Sep. 20, 2012)..15

*Uniloc USA, Inc. v. Motorola Mobility, LLC*,
   No. 17-cv-1658-CFC, 2019 U.S. Dist. LEXIS 21899 (D. Del. Feb. 11, 2019) ...14

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................2

Fed. R. Civ. P. 12(c) ............................................................................ 1, 3, 16

Fed. R. Civ. P. 12(f) .....................................................................................2

Fed. R. Civ. P. 15(a)(1)(b) ..........................................................................3

12340793/1

**INTRODUCTION**

After several years of proceedings in multiple U.S. district courts, a Canadian federal court, and the United States Patent and Trademark Office ("USPTO"), on October 12, 2016, Defendant Anvil International, LLC ("Defendant" or "Anvil") and Plaintiff Victaulic Company ("Plaintiff" or "Victaulic") settled, compromised, and resolved all existing and future patent disputes involving Anvil's "SlideLOK" couplings by entering into a global "Settlement and License Agreement, Release, and Covenant Not to Sue" (the "Settlement Agreement"). Victaulic's Complaint in this action directly contradicts the Settlement Agreement. Victaulic's Complaint centers on the same SlideLOK couplings, asserts one of the same patents that was previously litigated and expressly included under the Settlement Agreement, and includes new patents that are clearly covered under the Settlement Agreement's terms regarding future patent rights.

Anvil intends to file a Motion for Judgment on the Pleadings to Enforce Previous Settlement (the "MFJOTP") based on its Counterclaim Count I, which seeks judicial declarations that Victaulic's claims are barred by the Settlement Agreement's license grant and/or covenant not to sue. Anvil's anticipated MFJOTP has the potential to dispose of all Victaulic's claims. Under Fed. R. Civ. P. 12(c), Anvil must wait to file its MFJOTP until the pleadings are closed, which should

12340793/1

occur within three weeks. Anvil requests a stay now, however, before a scheduling order is entered, to defer and possibly conserve all the major costs of this complex litigation. A stay pending resolution of Anvil's anticipated MFJOTP is necessary to prevent Victaulic from reneging on the Settlement Agreement and requiring Anvil to litigate a case that should never have been brought in the first instance.

## THE NATURE AND STAGE OF THE PROCEEDINGS

On June 30, 2020, Victaulic filed this action against Anvil alleging infringement of United States Patent Nos. 7,712,796 ("the '796 patent"), 10,458,579 ("the '579 patent") and 10,627,025 ("the '025 patent") (collectively, the "Asserted Patents") (D.I. 1).

On August 20, 2020, Anvil filed its Answer, Affirmative Defenses, and Counterclaims (D.I. 10).

On October 13, 2020, Victaulic moved to dismiss Anvil's counterclaims for inequitable conduct and breach of contract (two of Anvil's nine counterclaims) pursuant to Fed. R. Civ. P. 12(b)(6), and to strike Anvil's inequitable conduct affirmative defense pursuant to Fed. R. Civ. P. 12(f) (D.I. 16).

On November 2, 2020, Anvil filed a First Amended Answer, Affirmative Defenses and Counterclaims (D.I. 22). Although believing its original counterclaims for inequitable conduct and breach of contract were sufficiently pleaded, Anvil amended these counterclaims as a matter of course, pursuant to Fed.

R. Civ. P. 15(a)(1)(b), to allege additional supporting facts and moot the purported deficiencies identified in Victaulic's motion to dismiss and motion to strike.

Anvil's Counterclaim Count I seeks a declaration as to Anvil's rights under the Settlement Agreement. Specifically, and as a threshold matter, Anvil seeks a declaration that all of Victaulic's patent infringement claims are barred by the license grant and/or the covenant not to sue under the Settlement Agreement (*see* D.I. 22 at Counterclaim Count I).

Anvil intends to file the MFJOTP asking the Court to enter judgment in Anvil's favor on Counterclaim Count I pursuant to Fed. R. Civ. P. 12(c), which may be made "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c). Here, the pleadings remain open because Victaulic has not yet answered Anvil's amended counterclaims. Victaulic's response to Anvil's amended counterclaims is due by December 7, 2020 (*see* 10/27/2020 Docket Order granting D.I. 20, the parties' Stipulation to extend certain deadlines). Because Anvil's amendments to its inequitable conduct and breach of contract counterclaims specifically addressed the arguments in Victaulic's prior motion to dismiss, Victaulic should file an answer to Anvil's amended counterclaims by December 7, 2020, thereby closing the pleadings and allowing Anvil to file its MFJOTP. Should Victaulic renew its

3

motion to dismiss on December 7, 2020,[1] the pleadings would then close as a matter of course after resolution of that motion.

The Court has set a Rule 16 Scheduling Conference for November 19, 2020 (D.I. 19). Anvil moves for a stay now, before a schedule has been entered and discovery begins in earnest, because Anvil's MFJOTP may bring this action to a swift close, thereby substantially conserving the parties' and the Court's resources.

## SUMMARY OF ANVIL's ARGUMENT

1.    This Court has the inherent power to stay proceedings in order to control the disposition of cases on its docket with economy of time and effort for itself and the parties. It is well settled that this authority extends to staying proceedings to consider a potentially dispositive motion. The power to stay proceedings, and the judicial efficiencies from doing so, are equally applicable when the potentially dispositive motion is not yet on file but is clearly anticipated.

2.    All of the factors the Court typically considers when considering the propriety of a stay weigh in favor of granting Anvil's motion.

    a.    The first factor – whether granting a stay will simplify the issues for trial – weighs heavily in favor of a stay because if Anvil's MFJOTP is granted on any one of the grounds in Counterclaim Count I, it would dispose of all Victaulic's claims. Because Anvil's Counterclaim Count I presents several

---

[1] Anvil expects that any renewed motion to dismiss would be filed primarily as a tactical maneuver to delay Anvil's ability to file its MFJOTP.

independent and alternative grounds for finding Victaulic's claims barred by the Settlement Agreement, there are several possible outcomes from Anvil's MFJOTP under which Victaulic's claims would simply go away, rendering discovery efforts futile.

b.     The second factor – the status of the litigation – weighs strongly in favor of granting a stay, as the present case is in its infancy. Anvil brings this motion at the onset of the lawsuit, and at the ideal stage for the Court and the parties to receive the full benefit of a stay pending resolution of Anvil's potentially dispositive MFJOTP. Because the threshold issues in Anvil's anticipated MFJOTP are already clear, Anvil moves the Court for a stay now, rather than waiting until the pleadings are closed. It would be inefficient to proceed with all aspects of this complex litigation when Anvil's MFJOTP will be ready for a determination more immediately.

c.     The third factor – whether a stay would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to gain a clear tactical advantage – also weighs in favor of a stay. The only impact to Victaulic will be a brief wait until Anvil's MFJOTP is resolved. Because there are other active companies in the relevant fire protection market, there is little likelihood that a short stay will cause Victaulic meaningful loss of market share or erosion of goodwill for products it has been selling for more than four years. Victaulic's

decision not to seek a preliminary injunction also shows that the status quo should be maintained and no real prejudice will flow from the imposition of a stay. And even if Anvil's MFJOTP is successful, that would still be a win for Victaulic because ███████████████████████████████████████████████████ ████████████████████████████████████████████.

        d.     Finally, Anvil would suffer significant inequity and prejudice if a stay is not granted and Anvil is required to go forward with Victaulic's patent infringement claims before a ruling on its MFJOTP. The parties settled their patent disputes involving Anvil's SlideLOK couplings, including the 74FP coupling at issue in this case. Apparently unhappy with the deal it struck, Victaulic seeks to undo the parties' settlement through this action. In settling with Victaulic, Anvil gave up the opportunity to invalidate Victaulic's asserted patents and agreed ██████ ████████████████████████████████████████████████████ █████████████████████████████. Victaulic's Complaint against the same SlideLOK couplings in the face of the Settlement Agreement's broad license and covenant not to sue frustrates the public policy strongly favoring the settlement of patent disputes. This Court should exercise its inherent authority to stay this action and prevent the inequity of forcing Anvil to litigate a case that should never have been brought in the first instance.

12340793/1

## STATEMENT OF FACTS

I.   **The Parties and their Previous Settlement Resolving All Patent Disputes as to Anvil's "SlideLOK" Couplings.**

Headquartered in Exeter, New Hampshire, Anvil is a manufacturer of pipe fittings, couplings, pipe hangers and piping support systems (D.I. 22 ¶13).[2] Victaulic, based in Easton, Pennsylvania, provides, among other products and services, mechanical pipe couplings and pipe fittings for a range of applications (*id.* ¶14).

In 2012, Victaulic began claiming that Anvil's "SlideLOK" couplings infringed certain of Victaulic's patents (*id.* ¶15). This controversy led to proceedings in multiple U.S. district courts and in a Canadian federal court (*id.*). It also involved reexamination proceedings in the USPTO that Anvil instituted against certain of Victaulic's patents, including the '796 Patent asserted in this case (*id.* ¶16). Ultimately, on October 12, 2016, the parties entered into the Settlement Agreement to memorialize the parties' global settlement, which included a license grant, release, and covenant not to sue from Victaulic to Anvil, and resolve all the parties' claims and counterclaims relating to Anvil's SlideLOK couplings and Victaulic's patents (*id.* ¶17).

---

[2] Unless otherwise noted, citations to paragraph numbers in Anvil's First Amended Answer, Affirmative Defenses, and Counterclaims (D.I. 22) refer to paragraphs in Anvil's counterclaims.

For example, the Settlement Agreement includes the following broad license

grant from Victaulic to Anvil ████████████████████████████████████████

███████ :

████████████████████████████████████████
███████████ ███████████ ██████ █ ████ ███████
███████████████ █ ████████████ ██████ ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████ ███ █ ████ ████████ ████ ████ █████
██████ ██ ████ █ ████ ████████ ████ ████████
████████████████████████████

(D.I. 22. Ex. A §2.6.) (Emphasis added.)

One of the "Anvil Products" covered by the Settlement Agreement is the

SlideLOK Figure 74FP coupling ("74FP coupling"), shown below:



(D.I. 22 ¶21.) Since releasing the 74FP coupling in 2017, ███████████████████

████████████████████████████████████████████████████ (*id.*

¶25).

## II.   Victaulic's Attempt to Renege on the Parties' Settlement by Claiming that Anvil's SlideLOK 74FP Coupling is Not Covered by the Settlement Agreement When Sold With a Pre-Installed Element.

Anvil recently started offering to sell the SlideLOK 74FP coupling with

another element, i.e., a fire sprinkler hose, an end cap, or an end of line fitting, pre-

installed:



(*Id.* ¶¶26-29.)

After becoming aware of the first of these products, Victaulic's initial

reaction was to "to seek clarification from Anvil regarding that product vis-à-vis

the [Settlement Agreement]" (*id.* ¶159).  Anvil responded ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ (*id.* ¶30). Determined to

nevertheless claim that Anvil's new product was *not* licensed (despite the broad

scope of the Settlement Agreement), Victaulic rushed to file new, continuation

patent applications at the USPTO, including the applications that eventually issued

as the '579 Patent and '025 Patent (*id.* ¶160).

Victaulic's Complaint is thus based on one of the same patents that was

previously litigated and expressly licensed under the Settlement Agreement (the

'796 Patent), as well as on new patents that were clearly licensed under terms of

the Settlement Agreement regarding future patent rights (the '579 and '025

Patents) (*id.* at page 2).

## III.  Anvil's Counterclaim Count I Seeks a Judicial Declaration that the Settlement Agreement Grants Anvil a License Under the Asserted Patents to Sell the Accused Products.

As noted above, the Settlement Agreement grants Anvil a broad license

████████████████████████████████████████████████ (D.I. 22. Ex. A §2.6).

The Settlement Agreement provides the following definition of "Anvil Product,"



12340793/1



(*Id.* ¶48; *id.*, Ex. A, p. 2.)

Anvil's Counterclaim Count I sets forth in detail why the SlideLOK 74FP coupling is an "Anvil Product" ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ under the Settlement Agreement even when sold with a pre-installed element as in the Accused Products (*id.* ¶¶49-54).

The Settlement Agreement further provides ▆▆▆▆▆▆▆▆▆ ▆▆▆▆ ▆▆▆▆ ▆ ▆▆▆ ▆▆▆▆ that also qualify as "Anvil Products":



(Id. ¶56; *id.*, Ex. A, p. 2.)

Anvil's Counterclaim Count I also details why, in the alternative, to the extent the "variations" tests above even need to be considered, the Accused

12340793/1

Products satisfy both tests (*id.*, ¶¶55-63). Indeed, Anvil's counterclaim explains that Victaulic has effectively admitted that the Accused Products satisfy the "colorably different" standard, which is established under Federal Circuit case law, by alleging infringement of aspects of the '796 Patent that were previously asserted against the SlideLOK coupling (*id.*, ¶¶58-59).

Accordingly, a judgment in Anvil's favor on Counterclaim Count I as to the license grant under the Settlement Agreement would dispose of all of Victaulic's claims in this action.

## IV.   Anvil's Counterclaim Count I Also Seeks a Judicial Declaration that Victaulic's Claims are Barred by the Settlement Agreement's Covenant Not to Sue.

Anvil alleges in its Counterclaim Count I that even if Anvil's sales of the SlideLOK coupling with a pre-installed element do not fall within the Agreement's license grant in Section 2.6, Victaulic is nevertheless barred from suing Anvil for patent infringement by the covenant not to sue in Section 2.5 (D.I. 22 ¶82). Victaulic



(*id.* ¶85; *id.*, Ex. A, § 2.5) (emphasis added)). The covenant not to sue

(*id.* ¶86).

Accordingly, Anvil's Counterclaim I seeks a declaration that Victaulic's patent infringement claims against the SlideLOK 74FP coupling with a pre-installed element ███████████████████████ ████████████████████████████████████████ and are therefore barred under the Settlement Agreement (*id.* ¶87). Entry of judgment in Anvil's favor as to the covenant not to sue is therefore an additional or alternative basis for disposing of Victaulic's claims.

## ARGUMENT

### I. The Court Has Discretion to Stay Litigation Pending Resolution of a Potentially Dispositive Motion.

The power of a district court to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Neste Oil Oyj v. Dynamic Fuels, LLC*, No. 12-cv-1744-GMS, 2013 U.S. Dist. LEXIS 92416, at *2 (D. Del. July 2, 2013) ("A decision to stay litigation lies within the sound discretion of the court and represents an exercise of the court's 'inherent power to conserve judicial resources by controlling its own docket.'") (quoting *Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985)).

It is well settled that this authority extends to staying proceedings to consider a potentially dispositive motion. *See, e.g., In re Orthopedic Bone Screw*

13

*Prod. Liab. Litig.*, 264 F.3d 344, 365 (3d Cir. 2001) (affirming district court's stay of discovery pending motion to dismiss); *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. 17-cv-1658-CFC, 2019 U.S. Dist. LEXIS 21899, at *4 (D. Del. Feb. 11, 2019) (granting motion to stay pending resolution of potentially dispositive motion); *Kaavo Inc. v. Cognizant Tech. Sols. Corp.*, No. 14-cv-1192-LPS-CJB, 2015 U.S. Dist. LEXIS 46334, at *18-19, *9 n.6 (D. Del. Apr. 9, 2015) (staying patent cases pending potentially dispositive motions, and noting that Chief Judge Stark's Standing Order "leaves plenty of room for the Court to stay discovery and defer entry of a schedule if a case-dispositive motion to dismiss is pending"); *Coastal States Gas Corp. v. Dep't of Energy*, 84 F.R.D. 278, 282 (D. Del. 1979) (explaining that postponing discovery pending resolution of potentially dispositive motions "is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources").

The power to stay proceedings, and the judicial efficiencies from doing so, are equally applicable when the potentially dispositive motion is not yet on file but is clearly anticipated. *See Purdue Pharma L.P. v. Collegium NF, LLC*, No. 18-cv-226-CFC, D.I. 41 (D. Del. Dec. 10, 2018), attached hereto as Exhibit A (staying case "with the exception of briefing on and resolution of [d]efendants' anticipated motion for judgment on the pleadings and any discovery related to that motion" where parties recognized and agreed that defendant's patent exhaustion defense

12340793/1

represented "a threshold issue that should be determined early by the Court and without waste of the Court's or the parties' resources on unrelated aspects of the litigation"); *Purdue Pharma*, No. 18-cv-226-CFC (D. Del. June 19, 2019), attached hereto as Exhibit B (oral order staying case "with the exception of discovery and briefing on and resolution of [d]efendants' anticipated motion for summary judgment based on patent exhaustion"); *Ghaly Devices LLC v. Humor Rainbow, Inc.*, No. 1-19-cv-02318, Doc. 36, attached hereto as Exhibit E (S.D.N.Y. June 24, 2019) (minute order granting stay pending resolution of anticipated motion to dismiss).

## II.    All Relevant Factors Weigh in Favor of a Stay.

This Court typically considers "three factors when deciding a motion to stay: (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to gain a clear tactical advantage." *Princeton Digital Image Corp. v. Konami Dig. Entm't, Inc.*, No. 12-cv-1461-LPS-CJB, 2014 U.S. Dist. LEXIS 61555, at *6 (D. Del. Jan. 15, 2014). The Court "may also consider whether the moving party would face undue hardship or inequity in the absence of a stay." *St. Clair Intellectual Prop. Consultants v. Motorola Mobility*

*LLC*, No. 11-cv-1305-LPS, 2012 U.S. Dist. LEXIS 134834, at *2 (D. Del. Sep. 20, 2012). Here, all of these factors weigh in favor of a stay.

### A. Anvil's Anticipated Rule 12(c) Motion Will Dispose of the Case Under Several Possible Outcomes.

The first factor – whether granting the stay will simplify the issues for trial – weighs heavily in favor of a stay because if Anvil's MFJOTP is granted on any one of the grounds in Counterclaim Count I, it would dispose of all Victaulic's claims. Anvil's Counterclaim Count I seeks a determination that Victaulic's claims are barred by the broad and unambiguous license and/or covenant not to sue in the Settlement Agreement. These threshold issues may be determined on a Rule 12(c) motion for judgment on the pleadings. *See, e.g.*, *LifePort Sciences, LLC v. Cook Inc.*, No. 13-cv-362-GMS, D.I. 56 (D. Del. Feb. 5, 2015), attached hereto as Exhibit C (granting motion for judgment on pleadings that asserted patent was subject to covenant not to sue between parties).

Anvil recognizes that, "[i]n considering the prospects for simplification, [this] Court has assessed all of the possible outcomes of the proceeding or inquiry that the case would be stayed in favor of—not just the potential outcome most favorable to the party seeking the stay." *Kaavo*, 2015 U.S. Dist. LEXIS 46334, at *4. Here, there are several possible outcomes from Anvil's MFJOTP that would dispose of this case.

16

As described above, the Court could determine that Anvil's SlideLOK 74FP coupling is an "Anvil Product" ████████████████████████████ under the license grant even when sold with a pre-installed element. Alternatively, the Court could conclude that the Accused Products meet the tests for acceptable "variations" of the "Anvil Products" licensed under the Settlement Agreement. Further, even if the Accused Products are deemed not to fall within the Settlement Agreement's license grant, the Court could hold that Victaulic is nevertheless barred from suing Anvil for patent infringement by the covenant not to sue.

Thus, there are several scenarios in which Anvil's MFJOTP is granted, Victaulic's claims simply go away, and the parties' discovery efforts will have been pointless. This factor therefore weighs heavily in favor of a stay.

### B.   The Early Stage of the Litigation and Minimal Investment of Resources Strongly Favor a Stay.

"This factor weighs strongly in favor of granting a stay, as the present case is in its infancy." *Neste Oil*, 2013 U.S. Dist. LEXIS 92416, at *15. Anvil brings this motion at the onset of the lawsuit to maximize the potential benefit of a stay. No schedule has been entered, no trial date has been set, and discovery is in a nascent stage.[3] The parties have not yet incurred substantial costs for discovery,

---

[3] On November 4, 2020, within hours of the parties' Rule 26(f) conference, Victaulic served Anvil with twelve (12) interrogatories and sixty-two (62) requests for production that broadly seek contentions and documents on every patent-

contentions relating to the three Asserted Patents and several Accused Products, or claim construction. As a result, major expenses of the case can be deferred by a stay, and may prove unnecessary if the Court determines that Victaulic's claims are barred by the Settlement Agreement.

Anvil respectfully submits that this case is at the ideal stage for the Court and the parties to receive the full benefit of a stay pending resolution of Anvil's potentially dispositive MFJOTP. *See Kaavo*, 2015 U.S. Dist. LEXIS 46334, *10 ("With the Court and the parties having invested relatively few resources in the cases since their filing, this factor strongly favors a stay."). That is why Anvil moves the Court for a stay now, rather than waiting until the pleadings are closed. The threshold issues in Anvil's anticipated MFJOTP are already clear. It would be inefficient to proceed with all aspects of this complex litigation when Anvil's MFJOTP will be ready for a determination more immediately.

### C.    A Stay Will Not Unduly Prejudice Victaulic or Allow Anvil to Gain a Clear Tactical Advantage.

The third of the stay factors also weighs in favor of a stay. While some delay and prejudice to a plaintiff are inherent in any stay, these are "insufficient to establish *undue* prejudice." *Neste Oil*, 2013 U.S. Dist. LEXIS 92416, at *4 (emphasis in original). Here, the only impact to Victaulic will be a brief wait until

---

related issue in the case. Anvil's proposed order on this motion includes a request to stay Anvil's objections and responses to these pending requests.

12340793/1

Anvil's MFJOTP is resolved. Because the potentially dispositive issues will be decided by this Court, rather than through a USPTO proceeding, for example, Anvil's requested stay will be relatively short and inconsequential. *Compare Cooper Notification, Inc. v. Twitter, Inc.*, No. 09-cv-865-LPS, 2010 U.S. Dist. LEXIS 131385, at *11-13 (D. Del. Dec. 13, 2010) (denying stay pending reexamination proceeding because stay "would almost certainly last many years" and resuming case afterward "would likely raise issues with stale evidence, faded memories, and lost documents").

Although Anvil and Victaulic do compete in certain markets (D.I. 22 ¶14), multiple active companies compete in the relevant fire protection market.[4] As a result, there is little likelihood that a short stay will cause Victaulic a meaningful loss of market share or erosion of goodwill. *Neste*, 2013 U.S. Dist. LEXIS 92416, at *8. Furthermore, Victaulic's decision not to seek a preliminary injunction shows that no "real prejudice will flow from the imposition of a stay." *Id.*, at *12; *Boston Scientific Corp. v. Cook Grp. Inc.*, 15-cv-980-LPS-CJB, Doc. 304, attached as Exhibit D, at 17-20 (Aug. 16, 2017) (granting stay where plaintiff did not seek

---

[4] Such companies include:
Grinnell (https://www.grinnell.com/index.php?section=emea-fp-2.1),
Shurjoint (http://www.shurjoint.com/eng/app_detail.aspx?ApplicationsID=10),
Titus (https://titusindustrial.com/fire/),
100 Tong (http://www.100t.cc/product/33/),
Shanghai Vision (http://visionmfr.com/Products2904/list_lcid_13.html), and
Argco (https://argco.com/fire-sprinkler.html), among others.

preliminary injunction, and noting "any harm from a stay at this stage may be adequately compensated by money damages"). Indeed, even if Anvil's MFJOP is successful, ████████████████████████████████████████████████

████████████████████████████████████████████████.

Further, the timing of Anvil's stay request demonstrates that Anvil is not seeking an inappropriate tactical advantage. Anvil "filed this motion early in the case, at a time that does not suggest inappropriate gamesmanship." *Kaavo*, 2015 U.S. Dist. LEXIS 46334, at *17.

Thus, this third factor also favors a stay.

### D.     Anvil Will Face Significant Inequity in the Absence of a Stay.

Whereas Victaulic would suffer no meaningful prejudice if this action were stayed, Anvil would suffer significant inequity if required to proceed before a ruling on Anvil's MFJOTP. The parties already settled their patent disputes involving Anvil's SlideLOK couplings, including the 74FP coupling at issue in this case, through the Settlement Agreement. At that time, Victaulic was selling couplings with pre-installed elements, but did not include any restrictions against such sales by Anvil in the Settlement Agreement. Apparently unhappy with the deal it struck, Victaulic now seeks to undo the parties' settlement through this unnecessarily complex patent action.

Notably, at the time of the parties' settlement, Anvil had recently obtained a favorable ruling from the USPTO's Patent Trial and Appeal Board ("PTAB") in an *inter partes* reexamination of the '796 Patent's parent patent, finding all challenged claims unpatentable (D.I. 22 at Answer ¶27). Similar invalidity arguments were pending before the PTAB in the *inter partes* reexamination of the '796 Patent (*id.*). Pursuant to the Settlement Agreement, Anvil withdrew from those reexaminations and gave up those favorable opportunities to invalidate Victaulic's asserted patents (*id.*). *See also id.*, Ex. A § 3.2 (providing for Anvil's cessation of participation in reexamination proceedings). As a further compromise, ███████████████

███████████████████████████████████████████████████

█████████████████████████████ (*id.*, Ex. A, §§ 4-5).

Moreover, this case is not a typical patent case with a license defense that is simply one of many defenses. This case is instead a disguised attempt to reopen a settled dispute that involved significant compromises. Victaulic's Complaint against the same SlideLOK couplings in the face of the Settlement Agreement's broad license and covenant not to sue frustrates the important public policy strongly favoring the settlement of disputes, particularly patent disputes, "the nature of which is often inordinately complex and time consuming." *P&G v. Paragon Trade Brands*, No. 94-cv-16-LON, 1996 U.S. Dist. LEXIS 22399, at *18 (D. Del. Mar. 29, 1996) (quotation and citation omitted); *see also Hemstreet v.*

21

*Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988) ("The law strongly favors settlement of litigation, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into.").

Anvil should not be forced to respond to Victaulic's immediate, overly burdensome, and potentially unnecessary discovery, or incur the significant fees and costs to defend against infringement claims involving three patents and multiple accused products, when the parties' patent disputes were previously resolved by agreement. This Court should exercise its inherent authority to stay this action and prevent the inequity of forcing Anvil to litigate a case that should never have been brought in the first instance.

## CONCLUSION

For the foregoing reasons, Anvil respectfully requests that the Court grant its motion to stay the case pending resolution of its Motion for Judgment on the Pleadings to Enforce Previous Settlement, which will seek a dismissal of all Victaulic's claims.

12340793/1

Dated: November 17, 2020                Respectfully submitted,

                                        MORRIS JAMES LLP

                                        *By: /s/ Kenneth L. Dorsney*
                                        Kenneth L. Dorsney (#3726)
                                        Courtland S. Hitch (#6720)
                                        500 Delaware Ave., Suite 1500
                                        Wilmington, DE 19801-1494
                                        (302) 888-6800
                                        kdorsney@morrisjames.com
                                        chitch@morrisjames.com

                                        TAYLOR ENGLISH DUMA LLP
                                        Todd E. Jones (*pro hac vice*)
                                        Jeffrey R. Kuester (*pro hac vice*)
                                        Coby S. Nixon (*pro hac vice*)
                                        Seth K. Trimble (*pro hac vice*)
                                        TAYLOR ENGLISH DUMA, LLP
                                        1600 Parkwood Circle, Suite 400
                                        Atlanta, GA 30339
                                        (770) 434-6868
                                        tjones@taylorenglish.com
                                        jkuester@taylorenglish.com
                                        cnixon@taylorenglish.com
                                        strimble@taylorenglish.com

                                        *Attorneys for Defendant and*
                                        *Counterclaim-Plaintiff Anvil*
                                        *International, LLC*

## CERTIFICATE OF COMPLIANCE WITH
## STANDING ORDER REGARDING BRIEFING

Pursuant to the November 6, 2019, Standing Order Regarding Briefing in All Cases, I certify that the font of this brief is Times New Roman, the type is 14-point, and the total word count is 4774 words as calculated by the word-processing system used to prepare the filing.

Dated: November 17, 2020          Respectfully submitted,

MORRIS JAMES, LLP

*By: /s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Courtland S. Hitch (#6720)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6855
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant and Counterclaim-Plaintiff Anvil International, LLC*

1

12340793/1

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PURDUE PHARMA L.P.,                      )
PURDUE PHARMACEUTICALS L.P. and          )
THE. P.F. LABORATORIES, INC.,            )
                                         )
              Plaintiffs,                )
     v.                                  )   C.A. No. 18-226 (CFC)
                                         )
COLLEGIUM NF, LLC and                    )
COLLEGIUM PHARMACEUTICAL, INC.,          )
                                         )
              Defendants.                )

## STIPULATION
## FOR RESOLUTION OF EXHAUSTION DEFENSE

WHEREAS, Defendants wish to amend their Answer to add patent exhaustion as an affirmative defense, and Defendants intend to file a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) based on patent exhaustion, or should the Court so treat it under Rule 12(d), a motion for summary judgment pursuant to Rule 56;

WHEREAS, Plaintiffs consent to Defendants' amendment of their Answer, but Plaintiffs will oppose Defendants' motion for judgment on the pleadings;

WHEREAS, without waiver of any of their arguments, the parties recognize that patent exhaustion represents a threshold issue that should be determined early by the Court and without waste of the Court's or the parties' resources on unrelated aspects of the litigation;

WHEREAS, the parties agree that the Court should stay this case, including discovery, with the exception of briefing on and resolution of Defendants' anticipated motion for judgment on the pleadings and any discovery related to that motion;

WHEREAS, the parties' specifically reserve their positions as to the need for, scope, and timing of discovery related to the anticipated motion for judgment on the pleadings;

IT IS HEREBY STIPULATED by the parties, subject to Court approval, that this case is STAYED, with the exception of briefing on and resolution of Defendants' anticipated motion for judgment on the pleadings and any discovery related to that motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
Megan E. Dellinger (#5739)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
mdellinger@mnat.com
    *Attorneys for Plaintiffs*

December 6, 2018

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Frederick L. Cottrell, III*

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4396)
Christine D. Haynes (#4697)
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
Cottrell@rlf.com
Farnan@rlf.com
Haynes@rlf.com
    *Attorneys for Defendants*

SO ORDERED this *16th* day of *December*, 2018.

_____
UNITED STATES DISTRICT JUDGE

2

# EXHIBIT B

ORAL ORDER, For the reasons discussed at the hearing on June 18, 2019, the case is STAYED with the exception of discovery and briefing on and resolution of Defendants' anticipated motion for summary judgment based on patent exhaustion. Ordered by Judge Colm F. Connolly on 6/19/2019. (nmf) (Entered: 06/19/2019)

As of June 20, 2019, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Purdue Pharma LP et al v. Collegium NF, LLC et al*
1-18-cv-00226 (DED), 6/19/2019, docket entry

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LIFEPORT SCIENCES LLC and            )
LIFESCREEN SCIENCES LLC,             )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )      Civil Action No. 13-362-GMS
                                     )
COOK INCORPORATED and                )
COOK MEDICAL INCORPORATED,           )
                                     )
            Defendants.              )

## ORDER

WHEREAS, on March 5, 2013, the plaintiffs LifePort Sciences LLC and LifeScreen

Sciences LLC (collectively, "the Plaintiffs") filed this patent infringement lawsuit against

defendants Cook Incorporated and Cook Medical Incorporated (collectively, "Cook"). (D.I. 1.)

The Plaintiffs allege that Cook infringes four patents: U.S. Patent Nos. 6,858,034 ("the '034

Patent"), RE42,380 ("the '380 Patent"), 5,681,347 ("the '347 Patent"), and 6,383,193 ("the '193

Patent");

WHEREAS, presently before the court is Cook's motion for judgment on the pleadings,

regarding the '034 Patent. (D.I. 20.) Cook asserts that the '034 Patent is subject to a covenant

not to sue between the parties;[1]

---

[1] The contract in question is a September 8, 2003, agreement ("2003 Agreement") between Cook
Incorporated and Boston Scientific Corporation ("BSC"). (D.I. 4, Ex. 1.) The 2003 Agreement includes a provision
that states:

> BSC hereby covenants not to sue COOK or any of its customers for
> infringement of any U.S. or foreign patent with regard to the manufacturer, use
> or sale of Cook's Zenith® family of products which are or have been sold
> commercially anywhere in the world . . . . BSC further promises to impose the
> covenant of this paragraph on any third party to whom BSC may sublicense,
> transfer or assign any title, interest, or rights to intellectual property covering
> these products.

WHEREAS, the court having considered the parties' papers, the pleadings, as well as the applicable law;

IT IS HEREBY ORDERED that:

1. Cook's Motion for Judgment on the Pleadings (D.I. 20) is GRANTED;[2]

---

(*Id.* § 4.2.1.)  The parties are in agreement that the Plaintiffs are successors-in-interest to the '034 Patent, which was originally held by an affiliate of BSC.  Because the '034 Patent reads on Cook's Zenith® products—at issue in this case—the Plaintiffs are subject to the 2003 Agreement.  The parties dispute, however, whether the above-quoted provision ("Section 4.2.1") applies to products sold after the effective date of the 2003 Agreement.  Indiana law governs the court's interpretation of the 2003 Agreement.  (*Id.* § 13.1.1.)

[2] Under Rule 12(d), presenting matters outside the scope of the pleadings tends to convert a Rule 12 motion to dismiss to a Rule 56 motion for summary judgment. Fed. R. Civ. P. 12(d). "Merely attaching documents to a Rule 12(c) motion, however, does not convert it to a motion under Rule 56. In ruling on a motion to dismiss, a trial court 'may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.' Further, in ruling on the motion a court generally has 'discretion to address evidence outside the complaint.'" *Citisteel USA, Inc. v. Gen. Elec. Co.*, 78 F. App'x 832, 835 (3d Cir. 2003) (internal citations and footnote omitted).

Although the 2003 Agreement is beyond the face of the complaint—it was included as an attachment to Cook's answer (D.I. 4, Ex. 1)—the parties do not dispute its authenticity, and plainly the Plaintiffs' claim arising from the '034 Patent ("Count I") implicates the 2003 Agreement.  (D.I. 1, ¶¶ 13–20.)  Thus, the court may appropriately consider the 2003 Agreement at this stage, without converting Cook's Rule 12(c) motion into a Rule 56 summary judgment motion. *See Citisteel*, 78 F. App'x at 835.

The parties' disagreement concerns Section 4.2.1 of the 2003 Agreement and the scope of Cook's products that are covered by the covenant not to sue.  Cook moves to dismiss Count I, arguing that the language of Section 4.2.1—"Cook's Zenith® family of products which *are or have been sold* commercially anywhere in the world"—unambiguously creates an ongoing protection from suit, not limited to the effective date of the 2003 Agreement: September 8, 2003.  (D.I. 4, Ex. A, § 4.2.1 (emphasis added).)  In contrast, the Plaintiffs maintain that the same language unambiguously demonstrates that the covenant not to sue only applied to Cook's products that were being sold as of September 8, 2003.  Thus, any products sold after that date would be free from the covenant.

Both parties maintain that the language of Section 4.2.1 is unambiguous and capable of interpretation by the court without reference to extrinsic evidence.  The Plaintiffs, however, contend that, to the extent ambiguity exists, discovery should be permitted and Cook's motion should be denied.

Applying Indiana law, the court agrees that Section 4.2.1 can be interpreted according to its own terms. "[T]he terms of a contract are not ambiguous simply because a controversy exists between the parties concerning the proper interpretation of terms." *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. Ct. App. 2000).  Neither party claims extrinsic evidence is necessary "to ascertain and effectuate the intent of the parties." *See id.*  As such, interpretation of Section 4.2.1 is purely a question of law, capable of resolution at even this early stage. *See Farmers Elevator Co. of Oakville, Inc. v. Hamilton*, 926 N.E.2d 68, 80 (Ind. Ct. App. 2010) ("[I]f the ambiguity arises not because of extrinsic facts, but by reason of the language used, construction of the ambiguous contract is a question of law for the trial court.").

The court finds that the use of "are or have been sold" in Section 4.2.1 created an ongoing covenant not to sue, not limited in time by the effective date of the 2003 Agreement.  The Plaintiffs place unwarranted emphasis on the argument that "are" and "have been" represent only present and past tense, but not future.  This simplistic view ignores the fact that present-tense language may also imply future action as well. *See, e.g.*, 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words used in the present tense include the future as well as the present . . . ."); *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 647 (6th Cir. 2009) ("All contracts use the present tense—at least in part. And the parties' use of the present tense here provides a baseline for creating *existing and* future obligations, and the context of the

2. Count I of the Plaintiffs' complaint (D.I. 1, ¶¶ 13–20) is DISMISSED.


Dated: February 5, 2015

UNITED STATES DISTRICT JUDGE

---

agreement and its other terms show that the agreement covers both types of commitments. . . . [L]egal drafters frequently use the present tense to cover the present and the future.").

Moreover, as Cook identifies, the use of the present perfect "have been" already encompasses products that were sold in the past *and* those that were being sold up to the effective date of the 2003 Agreement. In other words, if the court were to adopt the Plaintiffs' interpretation, the inclusion of "are sold" becomes superfluous, covering the same products that "have been sold." This result is inconsistent with traditional canons of contract interpretation. *See Samar*, 726 N.E.2d at 1290 ("[T]he language [should be] construed so as not to render any words, phrases, or terms ineffective or meaningless.").

The Plaintiffs' arguments invoking other sections of the 2003 Agreement are also unavailing. Section 5.2.1 includes language expressly imposing a release of claims "as of the EFFECTIVE DATE" of the 2003 Agreement. (D.I. 4, Ex. 1, § 5.2.1.) But the Plaintiffs ignore meaningful distinctions between a covenant not to sue and a release. *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 n.4 (3d Cir. 2001) ("A release is a provision that intends a present abandonment of a known right or claim. By contrast, a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue." (internal quotation marks omitted)). Moreover, Section 5.2.1 confirms that the drafters of the 2003 Agreement knew how to include temporal language that would have limited the covenant not to sue to the effective date of the agreement, had that been their intent. Similarly, Section 4.2.2 provides for an additional covenant not to sue for other Cook products but imposes a specific time limit: products sold "within three (3) years following the date of this agreement." (D.I. 4, Ex. 1, § 4.2.2.) The drafters' decision not to include these types of limitation in Section 4.2.1 "should not be disregarded." *See U.S. v. Clark*, 754 F.3d 401 (7th Cir. 2014).

Finally, the Plaintiffs point to Section 10.1.1 in attempt to show that products sold after the effective date of the 2003 Agreement would potentially be subject to suit. But this section clearly states: "Nothing contained in this Agreement shall be construed as . . . a warranty that any manufacture, sale, offer for sale, use or importation will be free from patent infringement *other than those detailed hereunder*; . . . or otherwise any license or other right under any patent . . . *except the licenses and rights expressly granted hereunder*." (D.I. 4, Ex. 1, § 10.1.1.) Thus, this section provides no insight into Section 4.2.1; it is merely a catch-all provision limiting the effect of the 2003 Agreement to the terms as outlined.

The court finds that Section 4.2.1 of the 2003 Agreement is an enforceable covenant not to sue. The 2003 Agreement bars Count I of the Plaintiffs' complaint, which accuses Cook of infringement of the '034 Patent. The court grants Cook's motion for judgment on the pleadings and dismisses Count I.

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION )
and BOSTON SCIENTIFIC SCIMED, )
INC., )
                                         )
           Plaintiffs/Counterclaim )
           Defendants, )
                                         )
      v.                            )      Civil Action No. 15-980-LPS-CJB
                                         )
COOK GROUP INCORPORATED and )
COOK MEDICAL LLC, )
                                         )
           Defendants/ )
           Counterclaimants. )

## MEMORANDUM ORDER

In this action filed by Plaintiffs/Counterclaim Defendants Boston Scientific Corporation

("BSC") and Boston Scientific SciMed, Inc. ("BSSI") (collectively "Plaintiffs" or "Boston

Scientific") against Defendants/Counterclaimants Cook Group Incorporated and Cook Medical

LLC (collectively "Defendants" or "Cook"), Plaintiffs allege infringement of United States

Patent Nos. 8,685,048 (the "'048 patent"), 8,709,027 (the "'027 patent"), 8,974,371 (the "'371

patent"), and 9,271,731 (the "'731 patent") (collectively the "asserted patents" or the "patents-in-

suit").

Presently before the Court is Cook's renewed Motion to Stay Pending *Inter Partes*

Reviews ("Motion"). (D.I. 74; D.I. 254) For the following reasons, the Court GRANTS Cook's

Motion.

### I.     BACKGROUND

#### A.     The Parties

BSC is a Delaware corporation with its principal place of business in Marlborough,

Massachusetts. (D.I. 19 at ¶ 2) It develops, manufactures, and supplies medical devices,

including endoscopic products for the treatment of diseases of the digestive system, such as its

Resolution™ Clip (the "Resolution Clip"). (*Id.* at ¶¶ 2, 10) BSSI is a Minnesota corporation with

its principal place of business in Maple Grove, Minnesota. (*Id.* at ¶ 3) It is a wholly owned

subsidiary of BSC, and it develops and manufactures endoscopic products, including hemostatic

clips distributed by BSC. (*Id.*) BSSI is the owner by assignment of the patents-in-suit. (*Id.*)

Cook Group Incorporated is an Indiana corporation with its principal place of business in

Bloomington, Indiana. (*Id.* at ¶ 4) It is alleged to be a major competitor of Plaintiffs in the

endoscopic hemostatic clip market. (*Id* at ¶ 15) Cook Medical LLC is an Indiana limited

liability company that also has its principal place of business in Bloomington. (*Id.* at ¶ 5) It too

is also alleged to be a major competitor of Plaintiffs in the endoscopic hemostatic clip market,

and it has sold the Instinct™ Endoscopic Hemoclip (the "Instinct product") since at least 2013.

(*Id.* at ¶ 15; D.I. 52 at 4).

## B.    The Asserted Patents

The patents-in-suit describe and claim endoscopic clips for use inside the body. Three of

the four asserted patents (the '048, '027, and '731 patents) (the "Adams patents") are entitled

"Device and Method for Through the Scope Endoscopic Hemostatic Clipping"; they share

substantially identical specifications. (D.I. 54, exs. B-D)[1] The Adams patents relate to

"compression clips used to cause hemostasis of blood vessels located along the gastrointestinal

tract delivered to a target site through an endoscope." ('048 patent, col. 1:21-23) Essentially, the

---

[1]       The asserted patents appear on the docket in this action more than once. Citations
to the patents will simply be to the '048 patent, the '027 patent, the '371 patent, and the '731
patent.

2

claimed invention makes up an apparatus and technique for endoscopists to treat gastrointestinal bleeding without the need for surgery and its associated risks. (*See id.,* cols. 1:27-34, 2:50-57) According to the patents, the invention's "key advantages" include "[t]he device's ability to repeatedly open and close the clip[,]" the ease with which the device can be rotated in certain embodiments, and the fact that, in certain embodiments, "the device is completely set up, with the clip already attached to the delivery device, unlike the competing device." (*See id.,* col. 3:5-20) These features are asserted to improve the success rate of procedures, reduce the time required to perform procedures, and allow for a device that is easier to use. (*Id.*)

The '371 patent (or "Durgin Patent") is entitled "Through the Scope Tension Member Release Clip" and claims an "apparatus for applying clips to tissue[.]" ('371 patent, col. 16:59) Aside from the fact that it does not claim a method, the Durgin Patent differs from the Adams patents in that it describes an assembly designed to provide multiple stages of "feedback" to the physician during the procedure. (*See id.,* cols. 1:44-62, 9:43-64) This feedback allows the user, *inter alia,* to be "certain of the status of the" clip assembly during the deployment operation, reducing the likelihood of deployment of a clip at an incorrect location. (*Id.,* cols. 1:33-35, 9:37-39)

## C. Procedural Posture

Boston Scientific commenced this action on October 27, 2015, alleging that Cook infringed three of the patents-in-suit (all but the '731 patent). (D.I. 1) On January 29, 2016, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions.

Boston Scientific filed an amended complaint alleging infringement as to all four patents-

3

in-suit on March 9, 2016. (D.I. 19) On July 15, 2016, Cook filed its amended answer and

counterclaims seeking declaratory judgments of non-infringement and invalidity of each of the

asserted patents. (D.I. 52) Trial in the case is scheduled for March 12, 2018. (D.I. 17)

      Cook filed its original "Motion to Stay Pending *Inter Partes* Reviews" on December 19,

2016. (D.I. 74) The Motion was fully briefed as of January 20, 2017. (D.I. 97) At the time,

Cook had submitted seven *inter partes* review ("IPR") petitions to the United States Patent and

Trademark Office's ("PTO") Patent Trial and Appeal Board ("PTAB") relating to the patents-in-

suit. (D.I. 75 at 1) Those seven IPR petitions sought to invalidate, *inter alia*, all of the then-

asserted claims in the case. (*Id.* at 2) However, as of the time the Motion was fully briefed, the

PTAB had not yet issued decisions on whether to initiate any of those requested IPR proceedings.

(*See, e.g.*, D.I. 97 at 3) Consequently, on March 31, 2017, the Court denied Defendants' Motion,

without prejudice to their ability to renew the Motion after the PTAB issued its institution

decisions.

      In an institution decision entered May 3, 2017, the PTAB instituted IPR proceedings on

the '027 patent, finding that there is a reasonable likelihood that claims 1-3 and 7-12 are

unpatentable. (D.I. 233, ex. A) On May 15, 2017, the PTAB instituted further IPR proceedings

on: (1) claims 1-19 of the '027 patent (including then-asserted claims 1, 3-11, 13-15, and 17-19),

(D.I. 252 & ex. A), and (2) claims 1, 3, 5-14, and 29-30 of the '048 patent (including then-

asserted claims 1, 3, 5-7, 9, 11-12, 14, and 29), (D.I. 252 & ex. B), finding that there was a

reasonable likelihood that those claims are unpatentable. And in a decision entered May 16,

2017, the PTAB instituted IPR proceedings on claims 1, 3-5, 7, 10-11, 13-15, and 17 (including

all of the then-asserted claims) of the '371 patent, finding that there was a reasonable likelihood

that those claims were unpatentable too.  (D.I. 252 & ex. D)

As of May 19, 2017, Plaintiffs were asserting 16 claims across the four patents-in-suit.
(D.I. 254 at 1 & n.1)  And in light of the IPR institution decisions referred to above, as of that
date, IPR proceedings had been instituted on eight of the 10 then-asserted claims from the '027,
'048, and '371 patents.  (*Id.*)  The parties were then still waiting on institution decisions as to two
of Defendants' petitions filed regarding the '731 patent.

On May 22, 2017, Cook renewed its Motion.  (D.I. 254)  The parties then submitted letter
briefing on the renewed Motion, which was completed as of June 2, 2017.  (*See, e.g.*, D.I. 269)
The Court held oral argument on the Motion on June 27, 2017.  (D.I. 303 (hereinafter, "Tr."))  At
the time of that hearing, the PTAB had still not yet issued an institution decision regarding the
two IPR petitions related to the '731 patent.  Accordingly, the Court ordered the parties to submit
a letter within seven days of the PTAB's decisions regarding institution of IPR as to the '731
patent, in which the parties were to provide the Court with their respective views as to the impact
of those decisions on the instant Motion.  The parties did so on July 11, 2017, indicating that the
PTAB had instituted IPR proceedings as to all six then-asserted claims from the '731 patent.
(D.I. 294)  And so, at that point, IPR proceedings had been instituted on 14 of the 16 then-
asserted claims of the four patents-in-suit (and 62 claims in the four patents-in-suit, in total).
(D.I. 294 at 2)

In the parties' July 11, 2017 joint letter, Plaintiffs proposed proceeding to trial in March
2018 on the following 12 claims:[2]

---

[2]     It is unclear whether Plaintiffs are proposing that the case as to the remaining four
asserted claims would be dropped at this point, or whether the case would simply be stayed as to
those other claims.

5

| Patent | Asserted Claims |
|--------|-----------------|
| '048 | 3, 4, 7, 29 |
| '027 | 20 |
| '731 | 4, 7, 8, 9, 13, 20 |
| '371 | 11 |

(*Id.* at 1) Of these claims, only claim 4 of the '048 patent and claim 20 of the '027 patent are not subject to currently-pending IPR proceedings. In the alternative, Plaintiffs proposed a path forward in which the case would be stayed with respect to all claims of the '731 patent and '371 patents, and would proceed to trial on claims 4, 7, and 14 of the '048 patent and claim 20 of the '027 patent. (D.I. 294 at 1-2 n.1)

## II.   STANDARD OF REVIEW

The court has discretionary authority to grant a motion to stay. *See Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985). This Court has typically considered three factors when deciding a motion to stay: (1) whether granting the stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay, or allow the movant to gain a clear tactical advantage. *See, e.g., Toshiba Samsung Storage Tech. Korea Corp. v. LG Elecs., Inc.*, 193 F. Supp. 3d 345, 348 (D. Del. 2016) (hereinafter, "*TSST-K*"); *Cooper Notification, Inc. v. Twitter, Inc.*, Civ. No. 09-865-LPS, 2010 WL 5149351, at *1 (D. Del. Dec. 13, 2010).

## III.   DISCUSSION

The Court will largely address the three stay factors in the context of Plaintiffs' main

6

proposal to proceed to trial on 12 claims ("Plaintiffs' proposal"), as outlined above and in the

parties' July 11, 2017 joint letter to the Court. (D.I. 294)  The Court will thereafter briefly

discuss Plaintiffs' alternative stay-related proposal ("Plaintiffs' alternative proposal").  The stay

issue here is a difficult one, as the case has been hard-fought already, and the Court's analysis is

not one-sided.  And so the Court addresses the relevant factors in some detail below.

## A.    Simplification of Issues for Trial

The PTAB has initiated IPR proceedings for 10 of the 12 (or 83%) of the asserted claims

captured by Plaintiffs' proposal, and has found there to be a reasonable likelihood that each of

those 10 claims will ultimately be found unpatentable.  As a result, there is a strong likelihood

that granting a stay now, and rejecting Plaintiffs' proposal, would simplify the case in a number

of ways.

For instance, the PTAB might ultimately decide that all 10 of these asserted claims are

invalid—in which case two of the four patents-in-suit (the '371 and '731 patents) would no longer

be at issue here, and the number of asserted claims of the '048 patent would be reduced from four

to one.  *Cf. 454 Life Scis. Corp. v. Ion Torrent Sys., Inc.*, Civil Action No. 15-595-LPS, 2016 WL

6594083, at *3 (D. Del. Nov. 7, 2016).  Should even some number of those 10 claims be found

invalid, that would certainly reduce the number of issues left to be litigated at summary judgment

and trial.  And even if some of these 10 claims are *not* found invalid: (1) Cook will still be

estopped from asserting in the instant litigation that those claims are invalid "on any ground that

[Defendants] raised or reasonably could have raised" during the IPR proceedings, *see* 35 U.S.C.

§ 315(e)(2); and (2) the Court will later be able to take into account any disclaimers arising

during the PTAB proceedings, *see Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed.

7

Cir. 2017).

Additionally, even as to the two asserted claims that are not at issue in an IPR proceeding, the PTAB's decisions as to other, related claims will likely be instructive. For example, claim 4 of the '048 patent depends from claims 1 and 3, both of which will be subject to IPR. A finding by the PTAB that claims 1 and 3 are invalid could thus simplify the invalidity analysis of claim 4.[3] *Princeton Dig. Image Corp. v. Konami Dig. Entm't Inc.*, Civil Action Nos. 12-1461-LPS-CJB, 13-1335-LPS-CJB, 2015 WL 219019, at \*3 (D. Del. Jan. 14, 2015); *see also* (D.I. 294 at 3). And, as Defendants have noted, "the limitations in '027 claim 20 are *all the same or substantially the same* as limitations in instituted claims, such as '048 [patent] claim 29 and '027 [patent] claim 15[.]" (D.I. 294 at 3 (emphasis in original); *see also* D.I. 254, ex. 3 at 2-3 (comparing '027 patent claim 20 with '048 patent claim 29 and '027 patent claim 15)) As such, the IPR proceedings may simplify issues regarding claim 20 of the '027 patent, inasmuch as they may address identical claim language that also appears in claim 20.[4]

To be sure, a stay of the entire case here is not a magic bullet. Of course, the IPR proceedings will not address two of the 12 now-asserted claims at issue, and absent settlement, eventually the Court will need to proceed to trial as to at least those two claims. The number of claims to try would also, obviously, be larger if additional asserted claims emerge unscathed from the IPR process. And while the IPR proceedings will address some number of the defenses

---

[3]     Claim 3 and claim 4 of the '048 patent relate to medical devices (clips) that share six different identical limitations, with claim 4 also having an additional limitation that implicates how the sheath of the clip moves relative to the clip's control wires. ('048 patent, col. 15:32-58)

[4]     Additionally, the PTAB is currently reviewing every claim of the '027 patent other than claim 20 (claims 1-19). (D.I. 294 at 3)

8

that Defendants have raised in this litigation, the proceedings will not address anywhere near all of them (and will not, in fact, even address many of the invalidity defenses currently at issue in this case). (D.I. 269 at 1)[5] Nor will the IPR proceedings touch on the question of infringement (or damages related thereto).

In the end, though, as a statistical matter, some substantial number of these 12 remaining claims are likely to be invalidated by the PTAB. (D.I. 75 at 11; D.I. 77, ex. 18 at 10 (showing that as of October 31, 2016, of the IPR trials that reached a Final Written Decision, 859 of 1,261 trials, or 68%, resulted in all instituted claims being found unpatentable, and 1,058 out of 1,261 trials, or 84%, resulted in at least some claims being found unpatentable)) On the whole, then, a complete stay "is very likely to substantially simplify the issues left to be litigated in this case[.]" *454 Life Scis. Corp.*, 2016 WL 6594083, at *3 (finding that this factor weighed "heavily in favor of granting a stay" where the PTAB granted review of every asserted claim in the case, even though the IPR proceedings would not address a number of remaining defenses). This factor thus weighs in favor of a stay.

## B. Status of the Litigation

Granting a stay early in a case can be said to advance judicial efficiency and "maximize the likelihood that neither the Court . . . nor the parties expend their assets addressing invalid claims." *Id.* at *4 (internal quotation marks and citation omitted). Yet when a request for a stay comes after discovery is complete or nearly complete, and a trial is imminent, it is less likely to

---

⁵        For example, Plaintiffs assert that in its expert report on invalidity, Cook "advances an average of 18 grounds of invalidity under [35 U.S.C.] §§ 102 and 103 for each of the 16 asserted claims—the vast majority of which were not included in Cook's IPR petition or form a ground on which review was instituted." (D.I. 294 at 1 & ex. A) And they note that the same can be said of Cook's expert's opinions under 35 U.S.C. § 112. (*Id.*)

9

be granted. *Id.* In such circumstances, the Court and the parties have already expended

significant effort on the litigation, and the principle of maximizing the use of judicial and litigant

resources is best served by seeing the case through to its conclusion. *Id.*

When the instant Motion was filed in December 2016,[6] this matter was approximately 14

months old. The following case events had already occurred: (1) the Court had issued a

Scheduling Order and set a trial date, (D.I. 17); (2) Plaintiffs had amended their Complaint to

include the '731 patent, (D.I. 19); (3) the parties had exchanged initial disclosures and ESI

disclosures, (D.I. 22-23; D.I. 28-29); (4) the parties had served infringement and invalidity

contentions, (D.I. 38; D.I. 42); (5) the Court had resolved a Protective Order dispute, (D.I. 36);

and (6) the parties had fully briefed the matter of claim construction, the Court had held a

*Markman* hearing, and a Report and Recommendation regarding claim construction was soon to

be issued, (D.I. 56-57; D.I. 60-61; D.I. 67; D.I. 80). On the other hand, by that point, no

*Markman* decisions had in fact issued, and fact discovery was not set to close for nearly another

four months.[7] (D.I. 17 at ¶ 8(a)) The cutoff for expert discovery was nearly nine months away

then, and trial was approximately 15 months away. (*Id.* at ¶¶ 8(f)(iv) & 22)[8]

_____

[6]        As a general matter, when considering this "status of the litigation" factor, the
Court should assess the situation at the time when a motion to stay is first filed. *Cf.*
*VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1317 (Fed. Cir. 2014) ("Generally, the
time of the motion is the relevant time to measure the stage of litigation."); *see also Versata*
*Software, Inc. v. Callidus Software, Inc.*, 771 F.3d 1368, 1373 (Fed. Cir. 2014) ("[G]enerally the
time of *filing* the motion will be the relevant stage at which to measure this [type of "status of
litigation"] factor.") (emphasis in original), *vacated as moot*, 780 F.3d 1134 (Fed. Cir. 2015).

[7]        On the same day that Cook filed the Motion, the parties stipulated to extend the
deadline for fact discovery by one month, to May 12, 2017. (D.I. 78)

[8]        Since the filing of the Motion, the Scheduling Order has been amended, and
various deadlines extended. (*See, e.g.*, D.I. 292 at 2) The close of expert discovery is now

But in this case, it makes more sense to assess the status of the litigation from the date of

the final relevant institution decisions, here, on June 30, 2017.  (D.I. 291, exs. A-B)  While the

"status of the litigation" factor is often assessed from the point at which the stay motion is filed,

that is not a hard and fast rule, and it can be appropriate in some cases for a court to consider

later-occurring events through the time when PTAB review is granted.  *Cf. VirtualAgility Inc. v.

Salesforce.com, Inc.*, 759 F.3d 1307, 1317 n.6 (Fed. Cir. 2014).  And here, it seems only fair to

take the latter path.  After all, when it came to the "simplification" factor, the Court there took

into account events that occurred after the Motion was filed—the IPR institution decisions

themselves—and did so in a way that redounded to Defendants' benefit.

Measured from the point when the last of the IPR petitions were granted, a lot had surely

happened in this case.  In the time between the filing of the Motion and the last of the IPR

institution decisions, for example, the following additional case events occurred:  (1) the Court

issued two Reports and Recommendations regarding claim construction, (D.I. 80; D.I. 193); (2)

the Court resolved numerous discovery disputes, (*see* D.I. 119; February 15, 2017 Oral Order;

March 27, 2017 Oral Order; March 29, 2017 Oral Order; April 4, 2017 Oral Order; April 24,

2017 Oral Order; April 27, 2017 Oral Order; D.I. 257; May 26, 2017 Oral Order); (3) the Court

resolved a dispute regarding Defendants' request to file an amended pleading, (D.I. 268; June 28,

2017 Oral Order); (4) fact discovery closed; and (5) expert discovery began.

To be sure, there is still plenty of work left to be done in the case (and plenty of work that

the parties might be spared from, depending on the PTAB's decisions, were a stay issued now).

This includes the District Court's resolution of certain objections regarding claim construction,

September 29, 2017.  (*Id.*)  The trial date (March 12, 2018) has remained unchanged.

11

the conclusion of expert discovery, the completion of what will likely be a very time-intensive

summary judgment process, and the run up to trial itself.

But at this stage, the parties and the Court have clearly devoted a significant amount of

time and effort into the matter. This factor should thus disfavor a stay.[9]

## C.     Undue Prejudice

This Court has often analyzed whether a non-movant (here, Plaintiffs) would suffer undue

prejudice (and whether a movant would gain an unfair tactical advantage) if a stay is granted, by

examining a number of subfactors:  (1) the timing of the request(s) for review (here, for PTAB

review of certain claims); (2) the timing of the request for a stay; (3) the status of the proceedings

(here, the PTAB proceedings); and (4) the relationship of the parties. *SenoRx, Inc. v. Hologic,

Inc.*, Civ. Action No. 12-173-LPS-CJB, 2013 WL 144255, at *6 (D. Del. Jan. 11, 2013).  The

parties' briefs addressed each of these subfactors, and so the Court will as well.

### 1.     Timing of the IPR petitions and the request for stay

As to these two subfactors, the Court has explained that "in some sense, a motion to stay

---

[9]      *Cf. Pragmatus Mobile, LLC v. Amazon.com, Inc.*, C.A. No. 14-1436-LPS, C.A.
No. 14-440-LPS, 2015 WL 3799433, at *1 (D. Del. June 17, 2015) (concluding that this factor
weighed against a stay where "a trial date ha[d] been set for [approximately 15 months from the
date of the decision] and the parties ha[d] substantially completed document production,
exchanged invalidity and infringement contentions, and commenced claim construction briefing
in preparation for a *Markman* hearing"); *Copy Prot. LLC v. Netflix, Inc.*, C.A. No. 14-365-LPS,
2015 WL 3799363, at *1 (D. Del. June 17, 2015) (concluding the same, where at the time of the
motion's filing, the parties had engaged in a "substantial amount of discovery" and were set to
complete claim construction briefing shortly); *Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action
No. 11-902-LPS-CJB, 2013 WL 2372206, at *2-3 (D. Del. May 30, 2013) (concluding that this
factor weighed slightly against a stay, where the motion was filed 19 months after the filing of
the Complaint, a number of depositions had been taken or were scheduled, and the Court had
resolved multiple motions and discovery disputes, though the Court had not yet issued a
*Markman* Order).

pending [PTAB review] can always be said to seek a tactical advantage because it would not have been filed but for defendant's belief that the granting of a stay would be to its benefit." *SenoRx, Inc.*, 2013 WL 144255, at *6 (internal quotation marks, brackets and citation omitted). However, if the timing of the filing appears less focused on facilitating an orderly review of patent validity, and more focused on simply disrupting the progression of the non-movant's district court case for disruption's sake, that will weigh against a stay. *See, e.g.*, *Belden Techs. Inc. v. Superior Essex Commc'ns LP*, Civ. No. 08-63-SLR, 2010 WL 3522327, at *2 (D. Del. Sept. 2, 2010) (finding that requests for *inter partes* reexamination made 17 to 20 months after the lawsuit was initiated, followed by a motion to stay filed 11 days before trial, gave rise to such an inference); *St. Clair Intellectual Prop. Consultants, Inc. v. Sony Corp.*, No. Civ.A. 01-557JJF, 2003 WL 25283239, at *1 (D. Del. Jan. 30, 2003) (denying a motion to stay and noting that "the fact that the instant motion was filed after the close of discovery and weeks before the commencement of the scheduled trial date" supported the conclusion that delay would occasion undue prejudice).

Here, Cook filed the first of its IPR petitions on October 27, 2016, one day before the statutory one-year deadline for filing such petitions (and exactly one year after the filing of the initial Complaint in this case). (D.I, 89 at 3, 10; *see also* 35 U.S.C. 315(b))[10] The last of Cook's IPR petitions were filed on December 13, 2016, several months before the relevant filing deadline regarding the patent-at-issue in those petitions (the '731 patent). (D.I. 75 at 16; D.I. 89 at 3, 10) The instant Motion, in turn, was originally filed on December 19, 2016, six days after

---

[10]     Plaintiffs served the Complaint to Defendants by mail on October 28, 2015, one day after filing suit. (D.I. 5)

13

the filing of the last IPR petition. (D.I. 74)

Plaintiffs argue that Defendants' filing of at least the initial IPR petitions so close to the statutory deadline lends itself to an inference that Defendants were seeking an inappropriate tactical advantage. (*See* D.I. 89 at 10) To be sure, the Court does not wish to incentivize defendants like Cook to drag out the process of filing IPR petitions for no good reason but to facilitate delay. (Tr. at 45) But the Court has also previously stated that all else being equal, in "it is hard [for it] to conclude that filing for an IPR in the sanctioned statutory window speaks to sharp practice." *Sirona Dental Sys. GmbH v. Dental Wings, Inc.*, Civil Action No. 14-460-LPS-CJB, Civil Action No. 14-540-LPS-CJB, 2016 U.S. Dist. LEXIS 155706, at *26 (D. Del. Mar. 22, 2016) (citation omitted).[11]

Here, it makes sense for Defendants to have waited to file for IPR until Plaintiffs produced their initial chart of asserted claims in late April 2016, (D.I. 17 at ¶ 8(c); D.I. 75 at 7), so that Defendants had a clearer understanding as to what claims were really going to be at issue in this large, four-patent case (and relatedly, what claims it made most sense to challenge via the

---

[11]     Plaintiffs have cited to other decisions from this Court where judges have noted the fact that a party filed an IPR petition on or around the last day permitted by statute, and have factored that into their reasoning as to why a non-movant would face undue prejudice if a motion to stay were granted. But in those cases, there have tended to be other factors that were also at play, and that further bolstered the conclusion that the movant was attempting to unduly delay the proceeding. *See, e.g., Greatbatch Ltd. AVX Corp.*, C.A. 13-723-LPS, 2015 WL 8483986, at *1 (D. Del. Dec. 10, 2015) (finding that the undue prejudice factor weighed against a stay where defendants filed their petition for IPR on the last day permitted by statute, but also where defendants delayed moving for a stay until after the completion of discovery and summary judgment briefing—until almost a year after the PTAB initiated review and less than two months prior to the pre-trial conference); *Pragmatus Mobile*, 2015 WL 3799433, at *1 ("The timing of Moving Defendants' filing suggests they may be seeking a tactical advantage, given they were aware of the prior art asserted in their IPR petition many months before filing the petition just three days before the statutory deadline").

14

IPR petitions that they were to file). And those initial contentions, when they came in, still put quite a lot of claims at issue—50 in total, across the four patents-in-suit. (D.I. 75 at 7; Tr. at 60-61) So Defendants explain that they then waited a few months longer—"until after the claim construction hearing [held in October 2016]"—to begin to file their IPR petitions, so that they would be "able to provide the PTAB with a more complete record of the parties' claim construction positions, thus simplifying those proceedings before the USPTO." (D.I. 75 at 16) And this assertion does not appear to be without basis. In many instances, Defendants did in fact refer to (and adopt) Plaintiffs' proposed claim constructions proffered in the instant case when litigating validity of the patents-in-suit before the PTAB. (D.I. 76, ex. 11 at 11-12, ex. 12 at 12-13, ex. 13 at 12-15; D.I. 77, ex. 14 at 13-15, ex. 15 at 8-10, ex. 16 at 11-17, ex. 17 at 11-17)

If there had been *other* indications in this case (in addition to the near-deadline IPR filings) that Defendants were seeking delay for delay's sake, that would be different. But the Court does not have such evidence. In its view, Defendants have been at least as aggressive as Plaintiffs in pushing this case forward since its inception. In light of that, and in light of the substantial number of claims that were still at issue early in the case, the Court will not fault Defendants for the timing of their IPR petitions.[12] While Defendants could have moved a bit more swiftly, there is not the record here to conclude that they were engaging in inappropriate tactical conduct.

Taking all things into account, the Court finds this subfactor to be neutral. *Cf. Sirona*,

---

[12]     Moreover, nothing about the timing of the filing of the Motion itself (filed only six days after the filing of the final IPR petition) suggests an improper motive. *See Neste Oil OYJ v. Dynamic Fuels, LLC*, Civil Action No. 12-1744-GMS, 2013 WL 3353984, at *2 (D. Del. July 2, 2013) (granting a stay where "defendants . . . filed their motion to stay only a few days" after the petition for IPR was filed).

15

2016 U.S. Dist. LEXIS 155706, at *31.

## 2.    Status of the IPR proceedings

With regard to the status of the IPR proceedings, and their relationship to the impending trial date, there are considerations that weigh both for and against a stay.

Here, the PTAB instituted IPR as to the asserted claims of the '027, '048, and '371 patents in May 2017. (D.I. 233, ex. A; D.I. 252, exs. A-B, D) Those proceedings are not expected to be fully resolved by the PTAB until May 2018.[13] (D.I. 89 at 10); 35 U.S.C. § 316(a)(11). As to the '731 patent, the IPR proceedings were instituted on June 30, 2017, (D.I. 291, exs. A-B), with those proceedings expected to be resolved by the end of June 2018. The trial here is scheduled for March 2018.

On the one hand, this timing issue creates the prospect for real complication, if the Court does *not* stay the entire case now. This is not a scenario, obviously, where the Court will receive the PTAB's final decision on invalidity before the trial begins. Thus, there are innumerable scenarios where—if the trial proceeds forward and the PTAB later invalidates some of the asserted claims at issue a few months thereafter—then the jury's verdict (if it was favorable to Plaintiffs) could be in jeopardy. It might be difficult at such a point, for example, to easily parse out how much of a jury's damages award was attributable to claims that had since been invalidated, and how much was not. (*See* Tr. at 43)

On the other hand, a complete stay is sure to create some delay for Plaintiffs, who understandably want their day in court. While the "mere potential for delay is insufficient to

---

[13]    With a possible six-month extension by the PTO's Director for "good cause[.]" 35 U.S.C. § 316(a)(11).

16

establish undue prejudice[,]" *Nexans Inc. v. Belden Inc.*, C.A. No. 12-1491-SLR-SRF, 2014 WL 651913, at *2 (D. Del. Feb. 19, 2014), neither is it irrelevant to the Court's calculus, *see Kaavo Inc. v. Cognizant Tech. Sols. Corp.*, Civil Action No. 14-1192-LPS-CJB, Civil Action No. 14-1193-LPS-CJB, 2015 WL 1737476, at *4 (D. Del. Apr. 9, 2015). Here, were the case stayed now and re-started, for example, after the last of the PTAB's Final Written Decisions on invalidity, that would surely lead to a postponement of the trial date for a number of months. *Cf. Sirona*, 2016 U.S. Dist. LEXIS 155706, at *34.

Taking both of these considerations into account, the Court finds this "timing" subfactor to be neutral.

### 3.    Relationship of the parties

The final factor to consider in assessing the potential prejudice to the non-movant is the relationship of the parties, which typically involves considering whether the parties are direct competitors. *See, e.g., TSST-K*, 193 F. Supp. 3d at 352. Courts have recognized that when parties are direct competitors, there is a reasonable chance that delay in adjudicating the alleged infringement will have prejudicial consequences to the party asserting that infringement has occurred, including the potential for loss of market share and an erosion of goodwill. *Id.* (citations omitted).

It is uncontested that Boston Scientific and Cook are direct competitors. (*See* D.I. 75 at 17; D.I. 89 at 11-12)  There is a dispute, however, about whether the state of that relationship suggests that undue prejudice would befall Plaintiffs were a stay instituted now.

The Court is helped here by the fact that there is now a decent record on the competition question. For example, BSC's corporate designee Demetrios Petrou testified at his deposition

17

that Cook was one of BSC's two "main competitors" (along with another company, Olympus).

(D.I. 269, ex. 3 at 100) He further testified that, prior to the commencement of Cook's alleged

infringement, Defendants controlled no more than 1-2 percent of the market for resuseable clips,

but that as of the time of the deposition in April 2017, Defendants controlled approximately 20-

30 percent of that market. (*Id.* at 125, 265, 267) However, another one of BSC's corporate

designees, William Lafferty, provided data that appeared much more targeted and specific. Mr.

Lafferty agreed at his deposition in April 2017 that "in 2014 Boston Scientific had a market share

of 85 percent or so, [and] Cook had a share of 3 to 5 percent," with Olympus having a market

share of about five percent as well. (*Id.*, ex. 4 at 43) Mr. Lafferty said that from 2015-16,

"[Boston Scientific] was down into the 75 range[,]" while Cook "had jumped to 10 to maybe 12

[percent]," with Olympus maintaining five percent of the market. (*Id.*) In 2016, however, Mr.

Lafferty explained that "Boston [Scientific] has picked up some share again with the launch of

[the new] Resolution II [clip] in early [20]16[,]" such that Boston Scientific was then capturing

approximately 78 percent of the relevant market, with Cook having approximately 9-10 percent

of the market and Olympus remaining at 5 percent of the market. (D.I. 254, ex. 9 at 44) Mr.

Lafferty said that he believed that as of April 2017, those relevant percentages from 2016 had

remained about the same in the interval. (*Id.* at 44-45)[14]

　　This record—particularly the more specific testimony of Mr. Lafferty—suggests to the

---

[14]　　Cook also points to other testimony suggesting that the current state of competition between the parties is not unduly detrimental to Plaintiffs. For example, it notes Mr. Lafferty's testimony that although Cook's accused Instinct product "did capture some . . . shares from Boston [Scientific,]" it is not "really a huge success" commercially. (D.I. 254, ex. 9 at 196 (cited in D.I. 254 at 3)) It also notes that from 2011 through 2016, according to Mr. Lafferty's testimony, the list price for Boston Scientific's clip product has increased each year. (D.I. 254 at 3 (citing *id.*, ex. 9 at 184))

18

Court that while Boston Scientific and Cook certainly compete in this market, and while the alleged infringement at issue has harmed Boston Scientific's market position in the past, the situation at present is a bit different. Instead, it is much less clear that over the last year or so—a time period in which Boston Scientific's new clip product has been in the market—that Cook has been taking market share from Boston Scientific. Thus, as to whether a delay in the trial date *from March 2018 until late 2018/early 2019*, for example, will unduly prejudice Plaintiffs, the record does not strongly suggest that it will.[15]

There are a few other factors here that also suggest that any harm from a stay at this stage may be adequately compensated by money damages. (Tr. at 9 (Defendants' counsel noting that the parties were competitors, but asserting that the following issues address whether Plaintiffs are "behaving like a competitor *that has been hurt*") (emphasis added)) For example, Cook notes that, although Plaintiffs then had knowledge of their accused products, nevertheless: (1) approximately 18 months elapsed between issuance of two of the patents-in-suit (the '048 patent and the '027 patent) in April 2014 and Plaintiffs' filing of the instant action in October 2015, and (2) over six months elapsed between the issuance of the '371 patent in March 2015 and the start of this case. (D.I. 75 at 6, 17-18); *see also VirtualAgility Inc.*, 759 F.3d at 1319 (concluding that the facts weighed against a finding of undue prejudice where the patentee "waited nearly a year after the [asserted patent] issued before it filed suit against Defendants"). And it also notes that Plaintiffs did not seek preliminary injunctive relief in this case, despite having threatened to do so early in the case. (D.I. 75 at 18 (citing D.I. 13 at 1))

---

[15]     As for the erosion of "good will" (or reputational harm) the Court has no evidence as to that issue before it. (Tr. at 13)

Taking all of this into account, the Court cannot conclude that the parties' relationship indicates that a stay of the type contemplated here will unduly prejudice Plaintiffs. As such, this subfactor weighs in favor of a stay.

### 4.    Conclusion as to undue prejudice

With regard to the three subfactors that the Court considers in assessing whether there is undue prejudice, two are neutral and one favors a stay, such that in total, the undue prejudice factor slightly favors a stay. This, to the Court, underscores that while it is not preferable for Plaintiffs to wait some additional months before getting to trial, it will not unduly harm them to do so.

### D.    Overall Conclusion

On balance, the possibility of simplification of the issues weighs in favor of a stay, the status of the litigation weighs against a stay, and the prospect of undue prejudice weighs slightly in favor of a stay. While acknowledging that this is a close case, the Court is ultimately persuaded that the potential for significant simplification of the issues if the stay is granted is the most compelling factor here. A less-than-a-year stay can allow the Court and the parties to get the benefit of that simplification, while causing little injury to Plaintiffs in the meantime that cannot be compensated by money damages. Thus, a stay is warranted.

### E.    Plaintiffs' Alternative Proposal

As was noted above, Plaintiffs have also set forth an alternative proposal for a partial stay, in which this matter would proceed to trial on claims 4, 7, and 14 of the '048 patent and claim 20 of the '027 patent (and then later proceed to a second trial on other claims, if necessary). The Court finds that this alternative proposal does not significantly move the needle with regard

20

to any of the above analysis. The IPR proceedings are still likely to significantly simplify the case with regard to the '048 patent claims, the lone asserted '027 claim (and all of the other claims that would be stayed under this proposal). And it will serve judicial efficiency best, under the circumstances of this particular case, to have one trial as to all claims not found invalid by the PTAB, at one time.[16]

Had Plaintiffs proposed proceeding to trial first on the '027 patent alone, or had Plaintiffs now affirmatively reduced their claims to a very small number to be tried all at once (as opposed to simply offering a "stay" of the case as to the remaining 12 claims, and suggesting the Court proceed forward to a trial as to four), the Court's decision may have been different. (*See* Tr. at 42, 49-50) However, Plaintiffs have now had multiple opportunities to advance such proposals, and have not done so.

## IV.  CONCLUSION

For the reasons set out above, it is hereby ORDERED that:

(1)     Defendants' Motion is GRANTED. The proceedings are STAYED from the date of this Memorandum Order until a Final Written Decision is issued by the PTAB in the last of the currently pending IPR proceedings.

(2)     The parties shall timely advise the Court when decisions are issued by the PTAB in the IPR proceedings. To the extent that one or more of those proceedings conclude prior to the issuance of a PTAB decision (e.g., due to settlement), the

---

[16]     Moreover, the Court finds that Plaintiffs' alternative proposal cuts against its own argument that the Court should "avoid the substantial cost of piecemeal trials as particular claims emerge from IPR or from appeals of PTAB rulings." (D.I. 294 at 1 (citing *Intellectual Ventures I LLC v. Toshiba Corp.*, 221 F. Supp. 3d 534, 554 n.18 (D. Del. 2016)))

21

parties shall also timely advise the Court of that fact.

(3)     The Court will exclude from the stay: (1) the submission of reply expert reports, which are due September 1, 2017 (so that the expert report process, which is now nearly complete, may conclude), (D.I. 292); and (2) any efforts necessary for resolution of Defendants' pending "Motion to Dismiss for Improper Venue or, Alternatively, to Transfer Venue Pursuant to Fed. R. Civ. P. 12(b)(3) & 28 U.S.C. § 1406(a)[,]" (D.I. 282).  Otherwise, a stay of all other proceedings takes effect upon the filing of the instant Memorandum Order.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version shall be submitted no later than **August 23, 2017** for review by the Court, along with a motion for redaction that includes a detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: August 16, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

22

ORDER. For the reasons articulated on the record during the initial pretrial conference held on June 20, 2019, proceedings in this case are stayed pending resolution of the Defendants anticipated motion to dismiss. The Clerk of Court is directed to indicate on the docket that this case is stayed. (HEREBY ORDERED by Judge Gregory H. Woods on June 24, 2019) (Text Only Order)(Daniels, Anthony) (Entered: 06/24/2019)

As of June 25, 2019, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Ghaly Devices LLC v. Humor Rainbow, Inc.*
1-19-cv-02318 (NYSD), 6/24/2019, docket entry 36

# EXHIBIT E